### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ALLIANCE INDUSTRIES LIMITED**<br>   **and**<br>**ALLIANCE INDUSTRIES FZC**<br><br>     **v.**<br><br>**A-1 SPECIALIZED SERVICES &**<br>**SUPPLIES, INC.** | **CIVIL ACTION**<br><br>**NO.  13-2510** |

**Baylson, J.**                                                                                    **August 19, 2015**

<u>**MEMORANDUM RE SUMMARY JUDGMENT**</u>

### I. Introduction

This case involves an $80 million international dispute among three closely held companies owned by the members of one family arising out of eleven precious metals leases between those companies.  Plaintiffs Alliance Industries Limited ("Limited") and Alliance Industries FZC ("FZC") (collectively, "Alliance") move for summary judgment on their claims that Defendant A-1 Specialized Services & Supplies, Inc. ("A-1") breached the precious metals leases by retaining the leased metal and failing to compensate or return it to Alliance.

From Alliance's perspective, this case is a simple breach of contract action—Alliance owned the metal, A-1 signed leases for the metal, A-1 still has the metal, and A-1 has not paid for or returned the metal, so A-1 is liable.  Therefore, the Court should grant summary judgment in Alliance's favor.  Alternatively, Alliance contends it should be permitted to recover under an unjust enrichment theory.

From A-1's perspective, this dispute involves a complicated business restructuring (the "Larger Business Restructuring") pursuant to which the two lead dramatis personae—brothers Suresh and Ashok Kumar ("Kumar") Khosla—intended to reorganize their business affairs.

Presently, Kumar controls Limited and owns 50% of FZC.  Suresh controls A-1 and owns 50% of FZC.  As part of the Larger Business Restructuring, A-1 contends, the parties verbally agreed to a settlement that extinguished nine of the eleven leases at issue, and pursuant to which Kumar was to obtain 100% ownership of Limited and then transfer a 60% stake to Suresh.  In its defenses, A-1 asserts Kumar reneged on this arrangement, failed to transfer the ownership stake to Suresh, and refused to extinguish the leases.  Then, A-1 contends Kumar purported to subject A-1 to two additional leases with Limited, which he had no authority to do.  Additionally, A-1 raises an affirmative defense of set-off, claiming that Kumar, acting for Alliance, breached fiduciary duties he owed to A-1, and that Alliance aided and abetted Kumar and Suresh in diverting corporate opportunities from A-1 to Alliance.

Following extensive discovery, briefing, and argument, this Memorandum addresses a portion of this dispute, specifically (1) the construction and interpretation of a September 6, 2012 Settlement Agreement between the parties (and one other individual), (2) the existence of an alleged oral agreement between the parties to release the leases, and (3) A-1's affirmative defense of set-off.

Alliance principally relies on the failure of the Settlement Agreement to mention the leases and contends, therefore, that the Agreement does not cover them.  Alliance also denies the existence of an enforceable oral agreement to release the leases.  A-1 argues that the Settlement Agreement contains a broadly worded release provision that extinguished A-1's obligations under the nine leases then in existence.  Alternatively, if the Court finds the Settlement Agreement did not release the leases, A-1 asserts Suresh and Kumar entered into an enforceable oral agreement to release the leases.

As a general matter, both Alliance and A-1 advance legal arguments with regard to the Settlement Agreement that make the decision on summary judgment a close question. The Agreement does not mention the leases specifically and is focused more on claims related to the Khosla brothers' purchase of Limited and FZC from a third party, Vivek Gulatee ("Gulatee"). After sifting through the record and law, however, the Court concludes the Settlement Agreement's broad release of claims prevents the grant of summary judgment in Alliance's favor.

The Court also concludes there are disputes of material fact warranting a trial on whether an oral agreement in fact existed. The evidence suggests that Suresh and Kumar only had a preliminary agreement to agree, not an enforceable contract, but A-1 has produced sufficient evidence of the existence of such an agreement to survive summary judgment on this issue.

Finally, the Court will grant partial summary judgment in favor of Alliance on A-1's affirmative defense of set-off because A-1 has failed to state that defense as a matter of law.

## II. Background

**A. Procedural History**

On May 7, 2013, Limited filed a three-count complaint against A-1 alleging breach of contract and unjust enrichment.

On October 8, 2013, Limited and FZC, which joined as a party plaintiff, filed a Second Amended Complaint alleging breach of contract and unjust enrichment claims (ECF 25). On November 26, 2013, A-1 moved to dismiss or stay the Second Amended Complaint for reasons of international comity or *forum non conveniens* in light of an action pending in the United Kingdom (the "English Litigation") regarding the Settlement Agreement (ECF 32). After extensive briefing, the Court issued a Memorandum (ECF 39) and Order (ECF 40) on March 12,

2014, denying A-1's motion.  In making that determination, the Court expressed doubt that the English Litigation was truly parallel to this case and concluded that a dismissal or stay would be unfair to Alliance.

On May 5, 2014, Alliance moved to strike four of A-1's affirmative defenses:  set-off, substantial performance, laches, and representations in sworn statements and/or pleadings filed in other actions (ECF 53).  On September 11, 2014, the Court issued a memorandum (ECF 71) and Order (ECF 72) granting in part and denying in part Alliance's motion.  The Court granted the motion to strike A-1's set-off defense under Fed. R. Civ. P. 12(f), without prejudice, as overly broad and lacking in factual basis, but denied the motion to strike the other defenses. Alliance Indus. Ltd. v. A-1 Specialized Servs. & Supplies, Inc., No. 13-2510, 2014 WL 4548474, at *3 (E.D. Pa. Sept. 11, 2014).

On November 11, 2014, A-1 filed an Amended Answer re-pleading its affirmative defense of set-off with greater specificity (ECF 106).  Alliance did not move to strike the defense as set forth in the Amended Answer.

A-1 has not filed a counterclaim.

The parties engaged in numerous disputes regarding the scope of discovery, the propriety of depositions of certain attorneys, and the depositions of certain key players, including Suresh.

On December 14, 2014, Alliance moved for summary judgment (ECF 116) and filed an accompanying Statement of Undisputed Facts (ECF 117).  On January 26, 2015, A-1 filed its response (ECF 125, 126) and Counterstatement of Undisputed Facts.  On February 17, 2015, Alliance filed its reply (ECF 130) and response to A-1's Counterstatement of Undisputed Facts (ECF 131).

On March 31, 2015, the Court held a hearing on the privilege issues in the case and issued a Memorandum (ECF 152) and Order (ECF 153) on April 8, 2015, granting A-1's motion to compel deposition testimony of two attorneys and ordering other discovery.

On June 22, 2015, the Court held another hearing on the status of discovery and open motions.  On June 23, 2015, the Court issued a Scheduling Order (ECF 165) directing the parties to take various depositions during July and ordering Alliance to produce additional documents by July 6, 2015.  The Scheduling Order also set deadlines of August 27, 2015 for the filing of pretrial memoranda and trial briefs and August 28, 2015 for the filing of motions in limine.

The Court held oral argument on Alliance's summary judgment motion on July 21, 2015. At oral argument, A-1 orally moved for summary judgment, arguing that the Settlement Agreement released the nine leases then in existence.  See ECF 177, Hr'g Tr. 12:14-16, July 21, 2015.

Following argument, the Court allowed both parties to submit supplemental materials. On August 4, 2015, both Alliance (ECF 179) and A-1 (ECF 182) filed supplemental briefs.  In its supplemental brief, A-1 moved for summary judgment on the nine leases existing at the time of the Settlement Agreement and filed an Amended Counterstatement of Undisputed Facts.

## B. Undisputed Facts

Limited is a Gibraltar company with its principal place of business in the United Arab Emirates ("UAE").  ECF 117, Pls.' Statement of Undisputed Facts ("PSOF") ¶ 1.  Limited was incorporated in Gibraltar in 1998.  ECF 183, Def.'s Amended Counterstatement of Undisputed Facts ("DSOF") ¶ 10.  The original shareholders of Limited were Gulatee, the Khosla brothers' nephew, and Sudhir Chopra, Suresh's brother-in-law.  Id. ¶ 18.  As of 2010, Gulatee owned 80%

of the shares and Chopra owned 20% of Limited, and they were the directors of Limited.  Id.
¶¶ 19-20.  Currently, Limited is wholly owned and controlled by Kumar.  ECF 117, PSOF ¶ 3.

FZC is an UAE company with its principal place of business in the UAE.  Id. ¶ 2.  FZC
was incorporated in 2003 in the Sharjah Airport International Free Zone of the UAE.  ECF 183,
DSOF ¶ 12.  As of 2010, Gulatee and Chopra each owned 50% of FZC, and they were the
directors of FZC.  Id. ¶¶ 21-22.  Currently, Kumar and Suresh each own 50% of FZC, and
Kumar is the Manager of FZC.  ECF 117, PSOF ¶ 4; ECF 183, DSOF ¶ 136.

A-1, a Pennsylvania corporation based in Pennsylvania, is involved in the precious metals
business.  ECF 183, DSOF ¶ 3.  A-1 extracts materials containing platinum, palladium, and
rhodium ("PGMs") from spent catalytic converters and processes and packages that material for
shipment to Impala Refining Services, Ltd. ("Impala").  Id.  Impala refines the processed and
packaged materials to extract PGMs.  Id.  A-1 is owned 32% by Suresh, 31% by Kumar, 32% by
their brother Om Khosla, and 5% by Leena Khosla, Suresh's wife.  Id. ¶ 5.  All four shareholders
of A-1 are also directors, and the Khosla brothers were formerly officers of A-1.  Id. ¶¶ 6-7.
Suresh controls A-1.  Id. ¶¶ 3, 5-6.

In 2010 or 2011, Gulatee and Chopra decided that they no longer wished to be involved
in Limited and FZC and sought to be bought out by the Khosla brothers.  Id. ¶¶ 55-56.
According to A-1, Gulatee and Chopra used the leases as leverage in their negotiations with the
Khosla brothers by refusing to roll over the leases and demanding A-1 return or pay for the
metals under the leases in an attempt to extract a higher price from the Khosla brothers for their
shares in Limited and FZC.  Id. ¶¶ 56-57.

During the negotiations surrounding the Larger Business Restructuring, it was
contemplated that Suresh and Kumar would purchase the interests of Gulatee and Chopra in

Limited and FZC in relatively equal shares.  Id. ¶ 58.  Suresh and Kumar also contemplated releasing the leases as part of the Larger Business Restructuring.  Id.

In January or February 2012, Kumar purchased Chopra's 20% stake in Limited and 50% stake in FZC for $15 million.  ECF 117, PSOF ¶ 21; ECF 183, DSOF ¶ 95.

On April 30, 2012, Suresh and Kumar entered into a Memorandum of Understanding with Gulatee.  ECF 183, DSOF ¶ 89; ECF 126, Ex. 31.  Pursuant to this Memorandum of Understanding, Gulatee was to sell his shares in Limited for $40 million.  Id.  Suresh was to end up with a 60% stake in Limited and 50% of FZC, and Kumar was to acquire a 40% stake in Limited and 50% of FZC.  Id.  The Court concludes this Memorandum of Understanding is not a binding agreement in light of later developments.  See infra section IV.A.

Around 2008, A-1 began experiencing liquidity problems due, in part, to financing disputes with Impala.  ECF 183, DSOF ¶ 32.  To address the liquidity problems, A-1 began leasing metal from FZC and Limited.  Id. ¶ 33.

Between April 14, 2011 and January 18, 2012, A-1 and FZC entered into six precious metals leases (the "FZC Leases"), which Kumar signed on behalf of A-1.  ECF 117, PSOF ¶¶ 5-10 & Ex. 5-10; ECF 183, DSOF ¶ 46.  The FZC Leases are all entitled "Lease Confirmations," but the parties do not dispute that these "Lease Confirmations" reflect the terms of the leases entered into between A-1 and FZC.  ECF 117, PSOF Ex. 5-10.  The FZC Leases became rolling leases, meaning that after each term, Limited and FZC would roll each lease over into the next term and A-1's obligations under the leases were extended to the end of the next term.  ECF 183, DSOF ¶ 35.  The FZC leases are as follows:

| Lease Date | Amount Metal | Interest Rate | Return Date | Exhibit |
|---|---|---|---|---|
| April 14, 2011 | 7,950 t.oz. platinum | 3.75% | February 27, 2012 | PSOF Ex. 5 |
| April 24, 2011 | 14,000 t.oz. palladium | 3.75% | March 29, 2012 | PSOF Ex. 6 |
| April 24, 2011 | 4,000 t.oz. rhodium | 3.75% | April 5, 2012 | PSOF Ex. 7 |
| Sept. 20, 2011 | 2,500 t.oz. platinum | 4.30% | February 15, 2012 | PSOF Ex. 8 |
| Oct. 26, 2011 | 8,000 t.oz. palladium | 3.75% | June 14, 2012 | PSOF Ex. 9 |
| Jan 18, 2012 | 11,000 t.oz. palladium | 3.75% | April 14, 2012 | PSOF Ex. 10 |

On February 6, 2012, A-1 and Limited entered into three precious metals leases (the "Limited Leases"). ECF 117, PSOF ¶¶ 11- 13 & Ex. 11-13. The Limited Leases were signed by Gulatee on behalf of Limited. Id. The Limited Leases are as follows:

| Lease Date | Amount Metal | Interest Rate | Return Date | Ltd. Signatory | Exhibit |
|---|---|---|---|---|---|
| Feb. 6, 2012 | 6,000 t.oz. platinum | 4.75% | May 6, 2012 | Gulatee | PSOF Ex. 11 |
| Feb. 6, 2012 | 6,000 t.oz. palladium | 3.75% | May 6, 2012 | Gulatee | PSOF Ex. 12 |
| Feb. 6, 2012 | 3,000 t.oz. rhodium | 4.75% | May 6, 2012 | Gulatee | PSOF Ex. 13 |

In the summer of 2012, Suresh and Kumar had a falling out. ECF 183, DSOF ¶ 118. Suresh suspended Kumar's employment with A-1 temporarily, and the relationship between the brothers remained contentious. Id. ¶¶ 119-20.

On August 17, 2012, Limited sent A-1 a default letter as to the nine leases in default (the other two leases were not yet in existence). ECF 117, PSOF ¶¶ 17-18 & Ex. 16.

On September 6, 2012, Suresh, Kumar, Gulatee, A-1, Limited, and FZC executed a Settlement Agreement to resolve various disputes between them. ECF 117, PSOF ¶ 19 & Ex. 17; ECF 183, DSOF ¶ 74; see also infra section IV.B.

On or around September 17, 2012, Limited re-acquired the 80% stake held by Gulatee, pursuant to a Share Buyback Agreement, for $40 million. ECF 117, PSOF ¶ 22 & Ex. 18. As of

September 17, 2012, Kumar owned 100% of the shares in Limited.  Id.  He continues to maintain full ownership of Limited.  Id. ¶ 3.

On September 17, 2012, pursuant to the Share Purchase Agreement, Suresh acquired Gulatee's 50% stake in FZC.  Id. ¶ 22.  As of September 17, 2012, Kumar and Suresh each owned 50% of FZC.  Id.  The brothers continue to maintain those ownership stakes in FZC, and Kumar is the Manager of FZC.  Id. ¶ 4; ECF 183, DSOF ¶ 136.

On September 26, 2012, Alliance alleges A-1 entered into two additional leases post-date the Settlement Agreement (the "Post-Settlement Leases").  ECF 117, PSOF ¶¶ 14-15 & Ex. 14-15.  The Post-Settlement Leases were signed by Kumar on behalf of Limited, but no one signed these leases on behalf of A-1.  Id.  A-1 disputes the validity of the Post-Settlement Leases and whether they bind A-1.  ECF 183, DSOF ¶¶ 128-33.  The Post-Settlement Leases are as follows:

| Lease Date | Amount Metal | Interest Rate | Return Date | Ltd. Signatory | Exhibit |
|---|---|---|---|---|---|
| Sept. 26, 2012 | 4,000 t.oz. palladium | 3.75% | March 25, 2013 | Kumar | PSOF Ex. 14 |
| Sept. 26, 2012 | 4,000 t.oz. palladium | 3.75% | March 25, 2013 | Kumar | PSOF Ex. 15 |

On May 7, 2013, Kumar caused Limited to initiate this lawsuit against A-1.  Id. ¶ 134.  At Kumar's direction, FZC was added as a party plaintiff with the filing of the Second Amended Complaint.  Id. ¶ 135.  Kumar never sought Suresh's consent to file the lawsuit on behalf of FZC, even though Suresh owned 50% of the shares of FZC.  Id. ¶¶ 136-38.  A-1 raises a legal issue disputing the propriety of FZC being a party plaintiff.

### III. Overview of Parties' Arguments

#### A. Alliance's Claims

Alliance contends that this is a simple breach of contract case.  A-1 leased approximately $70 million of precious metal from Alliance under eleven leases, and A-1 did not pay for or

return the metals to Alliance.  Accordingly, A-1 is in breach of its obligations under the leases and summary judgment should be entered in Alliance's favor.

Alliance argues that the Settlement Agreement did not release the nine lease claims then in existence.  Alliance points out that the Settlement Agreement does not mention the leases and argues it is illogical to conclude such valuable claims would be released without being specifically mentioned.  Alliance argues that A-1's case is built largely around extrinsic evidence that should be excluded, under the parol evidence rule, from introduction in this case to change the meaning of the Settlement Agreement, a final integrated agreement between the parties.  Finally, Alliance contends that A-1 admitted in the English Litigation that the Settlement Agreement had nothing to do with the leases.

Alliance also contends the Post-Settlement Leases are binding on A-1.  Alliance argues that A-1 agreed to receive the metal subject to those leases to meet its customer demand, retained the metal when received, and never paid for it.  Accordingly, Alliance argues A-1 also breached the Post-Settlement Leases.

Finally, Alliance contends A-1's set-off defense is time-barred and cannot apply to the complex allegations A-1 raises, which do not involve a liquidated, mature debt with an easily ascertainable amount.  See infra section V.E.

**B. A-1's Contentions**

A-1 contends this case is far more complex than Alliance suggests.  In A-1's view, as part of the Larger Business Restructuring, Suresh and Kumar sought to purchase Limited and FZC from Gulatee and Chopra, who A-1 asserts were constructive trustees for the Khosla brothers.  As part of this transaction, A-1 argues the leases, which Gulatee and Chopra had used as leverage in their negotiations with the Khoslas, were to be extinguished.

A-1 argues in the alternative that (1) the Settlement Agreement released the nine leases then in existence or (2) Suresh and Kumar entered into a separate oral agreement to release the leases.  In arguing the Settlement Agreement released the leases, A-1 claims the broad language of the Settlement Agreement's release provision encompassed the leases.  A-1 also relies on extrinsic evidence purporting to show that the parties intended the release to apply to the leases. In the alternative, to the extent the Court concludes that the Settlement Agreement does not release the leases, A-1 argues Suresh and Kumar reached an oral agreement to release the leases as part of the Larger Business Restructuring.  Furthermore, A-1 alleges that, as part of the Larger Business Restructuring, Kumar was to obtain 100% ownership of Limited and then transfer a 60% stake to Suresh, but Kumar reneged on this agreement, failed to transfer the ownership stake to Suresh, and refused to extinguish the leases.

With regard to the Post-Settlement Leases, A-1 argues that Kumar bound A-1 to these leases without A-1's authorization or consent.  A-1 notes that its representative never signed the two leases and claims the leases just arrived in Suresh's mailbox one day with Kumar's signature.  A-1 does not dispute, however, that it retained the metal and did not pay for it.

Finally, A-1 asserts an affirmative defense of set-off against Alliance.  A-1 argues it is entitled to set-off damages it suffered when Alliance aided and abetted Kumar in breaching fiduciary duties owed to A-1 and aided and abetted Kumar and Suresh in diverting corporate opportunities from A-1 to Alliance.  A-1 contends that its set-off claims are timely and can be determined in a straightforward fashion.[1]

---

[1]  The parties also dispute whether FZC is a proper party to this litigation, an issue not addressed in this Memorandum.  A-1 argues that FZC is not a proper party because FZC, which is owned 50% by Kumar and 50% by Suresh, could not join the suit without Suresh's consent.  A-1 contends FZC should be considered a corporation, not a LLC, and accordingly UAE applies under Fed. R. Civ. P. 17.  A-1 submits an expert affidavit attesting that, under UAE law, FZC could not become a party plaintiff to this lawsuit without Suresh's consent.  Alliance responds that FZC is a LLC and, under Fed. R. Civ. P. 17, Pennsylvania law applies to determine its capacity to sue.  Under Pennsylvania law, Alliance contends A-1 cannot raise Kumar's alleged lack of authority to authorize FZC to file suit

## IV. Summary of Written Agreements

As the parties' arguments demonstrate, resolution of this case requires the Court to consider a number of agreements between the parties. This section provides an overview and construction of the relevant portions of the agreements at issue in this case.

### A. Memorandum of Understanding

On April 30, 2012, Suresh and Kumar entered into a Memorandum of Understanding ("MOU") with Gulatee. ECF 183, DSOF ¶ 89; ECF 126, Ex. 31. Pursuant to the MOU, Suresh and Kumar agreed to purchase all of Gulatee's shares in Limited for $40 million. The MOU indicates that, following the purchase of Gulatee's shares, Suresh would own 60% of Limited and Kumar would own 40%. Suresh and Kumar also agreed to purchase Gulatee's shares in FZC. After that purchase, each brother was to own 50% of FZC.

The MOU provides that all of FZC's assets, including metal leases, were to be transferred from FZC to Limited as soon as possible, and FZC was to operate as a shell company only for the next six months. The MOU also permitted Suresh and Kumar to sell part of the metal held by Alliance to raise money in order to buy out Gulatee. However, for reasons set forth below, the Court finds the MOU is not an enforceable agreement in light of the parties' subsequent execution of the Settlement Agreement and Share Buyback Agreement.

### B. Settlement Agreement

On September 6, 2012, Suresh, Kumar, Gulatee, A-1, Limited, and FZC executed a Settlement Agreement to resolve various disputes between them. ECF 117, PSOF ¶ 19 & Ex. 17; ECF 183, DSOF ¶ 74. The Settlement Agreement was entered in connection with the Share Buyback Agreement, pursuant to which Limited bought back Gulatee's 80% ownership stake,

---

as a defense to the claim by FZC. Additionally, Alliance produced an expert report on UAE law that indicates that (1) FZC is a LLC and (2) under UAE law, if it applied, Kumar had authority as Manager of FZC to authorize FZC to join this lawsuit. The Court will hold a hearing on this issue on September 9, 2015.

and the Share Purchase Agreement, pursuant to which Suresh purchased Gulatee's 50% stake in FZC. English law governs, and the Settlement Agreement includes an integration clause indicating that the Settlement Agreement represents the entire agreement between the parties. The following sections address the key provisions of the Settlement Agreement at issue in this case.

**1. Recital D Releases Claims**

Recital D sets forth a general statement that the agreement is intended to release certain claims. Recital D provides the following:

> To enable the Buyback Documents and the Alliance FZC [Share Purchase Agreement] to be executed, the Parties wish to settle, waive and release all claims that they may have as against each other that relate to, arise from, or are otherwise connected with, concerning, or related to (i) Alliance Limited, Alliance FZC or Alliance Limited's, or Alliance FZC's actual or proposed, present, past or future, interests, investments, transactions, operations or business, or (ii) any other transaction, arrangement, undertaking, understanding, agreement or contract (whether written or oral) between either or both of the Khoslas and/or A-1 (on the one hand) and Gulatee (on the other hand), excluding the Alliance FZC [Share Purchase Agreement], or (iii) their respective shareholdings and directorships (and related director's duties) in Alliance Limited and Alliance FZC, in each case, on the terms of this Deed.

**2. Definition of "Claims"**

The Settlement Agreement's definition of "Claim" plays an essential role in the parties' arguments about whether the Settlement Agreement releases the leases. "Claim" is defined as follows:

> (A) . . . all claims or causes of action of any kind whatsoever (whether present or future, actual, prospective, or contingent, whether or not know [sic] to any of the Parties at the date of this Deed, and including for any fees, costs or expenses) in any jurisdiction that relate to, arise from, or are otherwise connected to, or concern, the Prior Proposals, the Metal Transfers, or any other matter connected with, concerning, or related to:

(i) Alliance Limited, the SAIF-Zone Branch, Alliance FZC . . . actual or proposed, present, past or future, interests, investments, transactions, operations or business; or

(ii) Any other transaction, arrangement, undertaking, understanding, agreement or contract (whether written or oral) between either or both of the Khoslas and/or A-1 and/or any of their respective Affiliates and Agents (on the one hand) and Gulatee and/or any of his Affiliates and Agents (on the other hand) . . .

(iii) their respective shareholdings, directorships (and related director's duties), management positions (and related management duties) in Alliance Limited, the SAIF-Zone Branch, and Alliance FZC; or

(iv) any actions, omissions, decisions, or transactions made or effected by Gulatee or the Khoslas in their capacity as directors or managers of Alliance Limited, the SAIF-Zone Branch, or Alliance FZC,

## 3. Matters Excluded from Definition of "Claims

The Settlement Agreement's definition of "Claims" also provides that certain matters are not included in the definition of "Claims."  Excluded from the scope of "Claims" are:

(B) . . . future contractual claims between the respective parties to this Deed, the Buyback Documents, or the Alliance FZC [Share Purchase Agreement] that arise as a result of any breach (if any) by any party of its obligations under this Deed, the Buyback Documents, or the Alliance FZC [Share Purchase Agreement].

## 4. Section 3 Contains a Broad Release of Claims

Section 3 of the Settlement Agreement contains a broad release of claims.  The parties dispute whether this release encompasses the leases.  The release provides:

3.1    Each Party agrees (for itself and on behalf of each of its Affiliates and Agents) that this Deed shall constitute full and final settlement, and irrevocable and unconditional waiver and release, of all and any Claims of that Party and its Affiliates and Agents against each other Party and each other Party's Affiliates and Agents.

3.2    Each Party covenants and undertakes in favour and for the benefit of each other Party and each other Party's Affiliates and Agents that:

(A) it shall not make or maintain, and shall procure that none of its Affiliates or Agents make or maintain, any Claim against any other Party or any other Party's Affiliates or Agents;

(B) it shall not at any time sell, assign or otherwise transfer or purport to sell, assign, or otherwise transfer any Claim to any person (including its Affiliates and Agents) who is not bound by the terms of this Deed;

(C) it shall not in any way support, encourage, incite, maintain, assist, cause, or procure any person who is not bound by the terms of this Deed (including any Affiliate or Agent) to assert, institute or continue any Claim against any other Party, or any other Party's Affiliates or Agents; and

(D) it shall not bring a Claim against a third party (a "Relevant Third Party") who may then have recourse against any other Party or its Affiliates or Agents.

## 5. Recital C Discusses Prior Agreements Between the Khoslas and Gulatee

Recital C of the Settlement Agreement references prior agreements between the Khoslas and Gulatee.  It provides that "[p]rior to agreeing [sic] the Buyback Documents, the Khoslas and Gulatee executed various documents relating to prior proposals for the sale of Gulatee Alliance Limited Shares and Gulatee's Alliance FZC Shares to one or both of the Khoslas (the "Prior Proposals") and concerning the possibility of the transfer of the Metal Assets to the Khoslas and/or A-1 or any of their respective Affiliates in connection with the Prior Proposals (the "Metal Transfers").

## 6. Section 4 Terminates Agreements Concerning "Prior Proposals" and "Metal Transfers"

Section 4 of the Settlement Agreement contains a clause relating to the "Prior Proposals" and "Metals Transfers" that had been discussed between the Khoslas and Gulatee prior to the Settlement Agreement.  Section 4 terminates those agreements, providing:

Each Party agrees and undertakes (for itself and on behalf of each of its Affiliates and Agents) that with effect from the date of this Deed each document, understanding, arrangement and proposal (whether written or oral) that relates to, is connected with, or concerns the Prior Proposals and/or the Metal Transfers are irrevocably terminated and that no Party shall have any obligation or liability

15

under or in connection with any of them (including in respect of any antecedent breach) to any other Party or any other Party's Affiliates or Agents.

The terms "Prior Proposals" and "Metal Transfers," which are used throughout the Settlement Agreement, are purportedly defined in the Recitals of the Settlement Agreement.

## 7. Definition of "Prior Proposals"

The "Prior Proposals" include various documents executed by the Khoslas and Gulatee relating to the sale of Gulatee's stakes in Limited and FZC to one or both of the Khoslas. Prior to agreeing to the final form of the transaction to buy out Gulatee, "the Khoslas and Gulatee executed various documents relating to prior proposals for the sale of" Gulatee's stakes in Limited and FZC to one or both of the Khoslas, as referenced in Recital C. The Prior Proposals presumably include documents such as the MOU executed by the Khoslas and Gulatee. Under Recital D and Section 4, the parties and their affiliates agreed to release all claims and obligations relating to the Prior Proposals.

## 8. Definition of "Metal Transfers" and "Metal Assets"

The "Metal Transfers" concern the possible transfer of "Metal Assets" to the Khoslas and/or A-1 or their affiliates in connection with the Prior Proposals, as provided in Recital C. The Settlement Agreement defines "Metal Assets" as "any or all of the platinum, palladium and rhodium assets owned or controlled by Alliance Limited, including 3,908 ounces of platinum, 8,000 ounces of palladium, 32,000 ounces of rhodium." Under Recital D and Section 4, the parties and their affiliates agreed to release all claims and obligations relating to the Metal Transfers.

## 9. Relationship Between Prior Proposals, Metal Transfers, Metal Assets, and Leases

It is difficult to ascertain precisely what the Prior Proposals, Metal Transfers, and Metal Assets refer to and whether or how these terms relate to the leases. Interpreting Recital C as a

whole, it merely notes that the Khoslas and Gulatee had executed various documents relating to the structure and character of the Khoslas' purchase of Gulatee's shares in Limited and FZC, and the parties had discussed transferring certain amounts of metal to A-1 as part of this transaction. The Court also notes that the amount of Metal Assets that were to have been subject to the Metal Transfers, as detailed in the Settlement Agreement, appears to differ markedly from the amount of metal subject to the nine leases pre-dating the Settlement Agreement[2]:

| Metal | Amount of Metal Assets in Settlement Agreement | Amount of Metal Leased to A-1 |
|---|---|---|
| Platinum | 3,908 oz. | 16,450 t.oz. |
| Palladium | 8,000 oz. | 39,000 t.oz. |
| Rhodium | 32,000 oz. | 7,000 t.oz. |

The Court is not certain of the relationship, if any, between the quantity of the Metal Assets subject to the Settlement Agreement and the quantity of metal leased to A-1. The fact that significantly more platinum and palladium was leased to A-1 than is included in the Metal Assets subject to the Settlement Agreement would tend to support Alliance's view that the Settlement Agreement did not release the leases. The converse holds true for rhodium, however, since a much higher quantity of rhodium was included as Metal Assets subject to the Settlement Agreement than was leased to A-1.

**C. Share Buyback Agreement**

On September 17, 2012, Limited entered into a Share Buyback Agreement with Gulatee pursuant to which Limited acquired the 80% stake held by Gulatee for $40 million. ECF 117, PSOF ¶ 22 & Ex. 18. The Share Buyback Agreement had the effect of making Kumar the 100% owner of Limited. Id. The Share Buyback Agreement is governed by Gibralatar law. Id.

---

[2] The Court notes, however, that it is unclear whether the "ounces" used in the Settlement Agreement are the same measure as the "troy ounces" used in the leases.

Schedule 3 to the Share Buyback Agreement is of particular importance in this dispute. That Schedule lists the assets of Limited as of August 30, 2012, and it appears to include, as assets of Limited, quantities of metal including the metal leased to A-1.  This implies the leases were not released by the Settlement Agreement.

## V. Analysis

### A. Summary Judgment Standard

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.  Under Rule 56, the Court must view the evidence presented in the light most favorable to the non-moving party.  Id. at 255.[3]

### B. Construction of the Settlement Agreement

The Settlement Agreement is an integrated, signed document entitled to interpretation by the Court according to its terms.  However, the parties dispute the meaning and import of the Settlement Agreement.   A-1 contends the Settlement Agreement's broad release provision encompassed the nine lease claims then in existence, and that this step was contemplated as part of the Larger Business Restructuring of the Khosla brothers' affairs.  Alliance argues that the

---

[3] Two preliminary arguments A-1 made in its initial opposition to summary judgment are now moot because of the progress of this case.  First, A-1 argued summary judgment was premature because discovery was not complete. Since Alliance filed for summary judgment on December 14, 2014, however, significant progress in discovery has been made, and the Court has permitted the parties to supplement their positions with regard to summary judgment. Second, A-1 contended summary judgment should be denied because Alliance failed to submit expert affidavits to address the foreign law issues in this case.  However, Alliance submitted an expert affidavit on UAE law as requested by the Court, and the Court will hold an evidentiary hearing on the application of UAE law to this case on September 9, 2015, and thereafter resolve that issue.  Accordingly, the Court rejects A-1's arguments on these matters as moot.

Settlement Agreement does not mention the leases at all, that it is illogical to believe the lease claims were released without being mentioned, and that the Settlement Agreement was intended to deal with claims between the Khoslas and Gulatee relating to the buy out of Gulatee, not the leases between A-1 and Alliance.

## 1. Choice of Law

As a preliminary matter, the Court must determine the appropriate law to apply in interpreting the Settlement Agreement.  The Court notes the Settlement Agreement's choice of law clause indicates it is to be governed by English law.

Because the Court exercises diversity jurisdiction over this case, it must apply Pennsylvania's choice of law rules.  See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496 (1941); Hammersmith v. TIG Ins. Co., 480 F.3d 220, 226 (3d Cir. 2007).  Under Pennsylvania's choice of law methodology, the Court must first determine whether there is an "actual" conflict between English and Pennsylvania law.  Hammersmith, 480 F.3d at 231-232.

Pennsylvania courts generally honor the intent of the contracting parties and enforce a choice of law provision unless that provision conflicts with strong Pennsylvania public policy interests.  Kruzits v. Okuma Mach. Tool, Inc., 40 F.3d 52, 55-56 (3d Cir. 1994).  However, the Third Circuit has held it permissible for courts to disregard a choice of law provision specifying application of another jurisdiction's law if the parties focus their briefing on the forum state's law and there is no actual conflict between the law of the forum state and the other jurisdiction's law.  See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1074 (3d Cir. 1997); see also Hammersmith, 480 F.3d at 230 ("If two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary."); Sharma v. Skaarup Ship Mgmt. Corp., 916 F.2d 820, 825 n.3 (2d Cir. 1990) (applying New York law to interpret a contract

governed by English law where the parties agreed the relevant New York and English law was the same).

As noted above, the Settlement Agreement states it is governed by English law. The parties agree that the basic principles of English contract law and Pennsylvania contract law at issue in this case, including the parol evidence rule, are the same. <u>See</u> ECF 116, Pls.' Br. at 5 ("[T]he basic contract law for each jurisdiction is the same. As a result, Pennsylvania law applies to Alliance's claims."); ECF 182, Def.'s Supp. Br. at 3 ("The controlling principles of contract interpretation under English and Pennsylvania law are essentially the same regarding the interpretation of the Settlement Agreement."). Furthermore, the Court has already considered this issue and held, in a prior Memorandum in this case (ECF 39), that "[w]hile there might be some variation in English and Pennsylvania law, the parties' briefs on the conflicts of law show the central principles of contract interpretation are consistent, if not identical." <u>Alliance Indus. Ltd. v. A-1 Specialized Servs. & Supplies, Inc.</u>, No. 13-2510, 2014 WL 958957, at *11 (E.D. Pa. Mar. 12, 2014). The Court has also reviewed the English legal authorities submitted by both sides in this case, which confirms the understanding of the parties and the Court that English law and Pennsylvania are the same on the legal issues relevant to the construction of the Settlement Agreement. <u>See id.</u> ("This [similarity] is to be expected, as our common law of contracts is based on English common law.").

Accordingly, because English law and Pennsylvania law are the same, the Court will apply the law of the forum, Pennsylvania, in interpreting the Settlement Agreement.

**2. Pennsylvania Contract Law and Parol Evidence Rule**

Applying Pennsylvania law, the Court must ascertain how to interpret the Settlement Agreement. In making this determination, the Court must decide (i) whether the Settlement

Agreement is ambiguous, (ii) whether extrinsic evidence is admissible to show an ambiguity in the Settlement Agreement; and (iii) if the Settlement Agreement is ambiguous, whether parol evidence is admissible to clarify the ambiguity.

Under Pennsylvania law, a written contract is deemed to represent the intent of the parties, and the words of the contract are to be given their ordinary meaning. Kripp v. Kripp, 849 A.2d 1159, 1163 (Pa. 2004). "The strongest external sign of agreement between contracting parties is the words they use in their written contract." Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1009 (3d Cir. 1980). "When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself." Kripp, 849 A.2d at 1163. If the contract is unambiguous, it is interpreted by the court as a matter of law. Id.

Courts are generally not to consider extrinsic evidence in interpreting an unambiguous, fully integrated contract under the parol evidence rule. Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436-37 (Pa. 2004). Quoting the Pennsylvania Supreme Court approvingly, the Third Circuit has stated:

> The rule enunciated in Gianni v. Russell & Co., Inc., (281 Pa. 320, 126 A. 791) supra, is firmly embedded in the law of Pennsylvania and from that rule we will not permit a deviation for it is essential that the integrity of written contracts be maintained. . . . 'Where parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement: (citing cases). All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract * * * and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parol evidence: (citing cases).'

Mellon Bank, 619 F.2d at 1010 (quoting United Refining Co. v. Jenkins, 189 A.2d 574, 578 (Pa. 1963) (emphasis and citations omitted).

If the contract is ambiguous, however, the parol evidence rule will not apply and extrinsic evidence will be admissible to clarify the ambiguity. Yocca, 854 A.2d at 437. "When, however,

an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances." Kripp, 849 A.2d at 1163. A contract is ambiguous if it is "reasonably susceptible of different constructions and capable of being understood in more than one sense." Id. Ambiguous contracts are to be interpreted by the finder of fact. Id.

In determining as a matter of law whether a contract is ambiguous, which would permit the introduction of parol evidence, a court may consider extrinsic evidence. Mellon Bank, 619 F.2d at 1011. In Mellon Bank, the Third Circuit rejected a "four corners" approach in which the judge determines, from his or her point of view, if the contract is ambiguous. Id. at 1010-11 & n.9. Instead, the court instructed judges "to hear the proffer of the parties and determine if there is objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of differing meanings." Id. at 1011. Quoting approvingly once again from the Pennsylvania Supreme Court's United Refining decision, the Third Circuit stated:

> In the construction of any contract, certain principles must guide us: (a) if there is any doubt as to the meaning of a term of a contract, such term should 'receive a reasonable construction and one that will accord with the intention of the parties; and, in order to ascertain their intention, the court must look at the circumstances under which the (contract) was made'; (b) in construing a contract we seek to ascertain what the parties intended and, in so doing, we consider the circumstances, the situation of the parties, the objects they have in mind and the nature of the subject matter of the contract; (c) 'However broad may be the apparent terms of the agreement, it extends only to those things concerning which the parties intended to contract, and the subject-matter of their negotiations may affect the meaning of the words they employ, especially if, in connection with that subject-matter, the conventional interpretation would give an unreasonable or absurd result.'

Id. at 1010-11 (quoting United Refining, 189 A.2d at 580) (citations omitted) (emphasis deleted). Accordingly, the court must "consider the words of the contract, the alternative meanings suggested by counsel, and the nature of the objective evidence to be offered in support of that

meaning." Id. at 1011; see also St. Paul Fire and Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1431 (3d Cir. 1991).

### 3. Interpretation of the Settlement Agreement

Each side asserts that the Settlement Agreement is unambiguous. Alliance argues that the Settlement Agreement does not mention the leases at all, was intended to settle claims between Gulatee and the Khoslas arising out of the Khoslas' purchase of Limited and FZC, and that the release should be narrowly construed. A-1 contends that the broad release was meant to apply to all claims between the parties, including Limited, FZC, and A-1, and that it applied to the leases. A-1 also notes that the broad release did not explicitly carve out the leases.

#### a. Terms of Settlement Agreement

It is a close question as to whether the Settlement Agreement, by its terms, released the nine lease obligations then in existence. There is no dispute that the Settlement Agreement does not specifically mention the leases.

A-1 principally relies on the broad release provision in the Settlement Agreement. To fall under that provision, however, the leases must be deemed "Claims" under the Settlement Agreement.

The Settlement Agreement defines "Claims" as "all claims or causes of action of any kind whatsoever . . . that relate to, arise from, or are otherwise connected to, or concern, the Prior Proposals, the Metal Transfers, or any other matter connected with, concerning or related to" Limited and FZC or any transaction between the Khoslas and A-1, on the one hand, and Gulatee, Limited, and FZC, on the other hand. ECF 117, PSOF Ex. 17. A-1 argues the residual clause— that "Claims" include "all claims" relating to "any other matter" connected with Limited and FZC—includes the leases, which are transactions between A-1 and Limited and FZC.

Alliance contends this is a strained reading of the Settlement Agreement, and the Settlement Agreement contains terms supporting this view.

First, definition of "Claims" includes language that can be read as carving out future contractual disputes from the Settlement Agreement's scope.  "Claims" do not include "future contractual claims between the parties to this Deed," and the dispute about the leases could be interpreted as precisely such a future claim.  See id.  Moreover, the definition of "Claims" provides some specifics about what is included and excluded from the Settlement Agreement, and it does not mention the leases, which are valuable assets.

Second, Recitals C and D and the definition of "Claims" in the Settlement Agreement, as written, focus on disputes between Gulatee, Limited, and FZC (on the one hand) and A-1, Suresh, and Kumar (on the other hand).  See id.  This wording could be interpreted as evidence that the parties' intent was to settle all disputes regarding the transaction in which the Khosla brothers bought out Gulatee, not to release obligations under the leases.

Third, there is the inconsistency in the quantity of Metal Assets subject to the Settlement Agreement and the quantity of metal leased to A-1, which could also indicate that the Settlement Agreement was not intended to release the leases.

The release provision in the Settlement Agreement states that the Agreement releases "all and any Claims of that Party and its Affiliates and Agents against each other Party and each other Party's Affiliates and Agents."  ECF 117, PSOF Ex. 17.  A-1 argues that this broad release applies to the leases because the Settlement Agreement does not specifically carve them out from its scope.  See Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co., 124 F.3d 508, 522 (3d Cir. 1997) ("The omission of such language is significant . . . because other provisions . . . do contain limiting language."); Voloshen v. Mann, 140 A.2d 450, 453 (Pa. 1958) ("It is obvious from this

wording that the mention or failure to mention specific claims may not detract from the broad sweep of the release. He who sows in general language will reap the harvest of his voluntary widespread planting.").

The Settlement Agreement differs from the contract in <u>Pittston</u>, however, because the contract in <u>Pittston</u> contained limiting language in some, but not all, provisions.  See <u>Pittston</u>, 124 F.3d at 522.  The Settlement Agreement, by contrast, does not mention the leases at all.  The facts of this case also differ from <u>Voloshen</u>.  That case involved litigation between two sisters, Ida and Dorothy, about Ida's written promise, in a letter, to execute a will leaving her entire estate to Dorothy.  <u>Voloshen</u>, 140 A.2d at 451.  Although the release did not specifically mention the written promise, the Pennsylvania Supreme Court held the sisters must have had the written promise in mind because "Dorothy's whole claim against her sister was predicated on Ida's promise to make a will in Dorothy's favor, and that claim took definitive form in the indicated letter."  <u>Id.</u> at 452.  Here, by contrast, the Settlement Agreement appears to have had the primary purpose of releasing claims between Gulatee and the Khoslas relating to the Khoslas' purchase of Limited and FZC from Gulatee.  If the Settlement Agreement released the leases, as A-1 asserts, that would be a secondary purpose.  As indicated below, however, A-1 has raised a sufficient dispute of fact as to whether the release had this secondary purpose.

On the whole, there are circular arguments on either side—either the Settlement Agreement, by its terms, did not release the leases because it never mentioned them, or it did release the leases because, by not mentioning them, it did not carve them out of the broad release.  However, the Court concludes that, given the other provisions in the Settlement Agreement, but for the broad language of the release provision, proper legal construction of the Settlement Agreement favors Alliance's view.

**b. Extrinsic Evidence**

Nevertheless, because the release provision contains broad language, the Court must take that language into account when construing the Settlement Agreement.  The Court considers the Settlement Agreement ambiguous as to whether it releases the leases by its terms.  As a result, the Court will review objective, extrinsic evidence in support of each party's position.

**i. Share Buyback Agreement**

The first piece of relevant extrinsic evidence is the Share Buyback Agreement, which was executed on September 17, 2012, and indicates that the leases are assets of Limited in the listing of Limited's metal assets in Schedule 3.  ECF 117, PSOF Ex. 18.  If the Settlement Agreement was intended to release the leases, it is logical to conclude that the leased metal would not be included as assets of Limited in the Share Buyback Agreement.  A-1's response is that (i) the Share Buyback Agreement does not specifically mention the leases or the quantity of metal leased under them and (ii) the Share Buyback Agreement represented the assets of Limited as of August 30, 2012, prior to the execution of the Settlement Agreement on September 6, 2012.

A-1's arguments are not necessarily convincing for two reasons. First, A-1 admits the quantity of metal listed in the Share Buyback Agreement is sufficient to encompass the amounts of metal subject to the leases.  Second, the Share Buyback Agreement was designed to be executed around the same time as the Settlement Agreement as part of what A-1 calls the Larger Business Restructuring, so it seems likely that if the Settlement Agreement was intended to release the leases, that would have been reflected in the Share Buyback Agreement.

**ii. Contemporaneous Writings**

The second category of extrinsic evidence concerns writings made around the time of the Settlement Agreement and Share Buyback Agreement.  These writings, perhaps entitled to

greater weight than declarations and deposition testimony given in the course of litigation, provide some objective evidence of the parties' intentions in executing the Settlement Agreement.   Alliance cites evidence that the parties believed the leases would be released following the purchase of Limited and FZC by Suresh and Kumar.   In the months after the Settlement Agreement, Suresh wrote to Kumar on several occasions asking for the leases to be written off:

- On November 6, 2012, Suresh sent an email to Kumar trying "to resolve certain imperative issues immediately" and offering "propositions."  ECF 125, Def.'s Resp. Br., Ex. 45.  These propositions included "Write off Leases in Alliance Industries Limited and Alliance Industries FZC."  Id.

- On November 15, 2012, Suresh again sent an email to Kumar asking him to write off the leases.  Id. Ex. 46.

- On February 27, 2013, Suresh wrote to Kumar asking him to resolve outstanding issues and requesting that Kumar agree "to write-off all the metal leased to A-1 from FZC."  Id. Ex. 49.

This evidence indicates that although Suresh may have thought there was an agreement or understanding to release the leases following the buy out of Gulatee, the Settlement Agreement itself did not release the leases.  Had it done so, there would be no need for Suresh and Kumar to take another step in order to release the leases.

Another way to view these documents, however, is that Alliance, through Kumar, reneged on the release of the leases in the Settlement Agreement.  On December 12, 2012, Suresh wrote to Isaac Massias, a Gibraltar lawyer for the brothers, referencing his desire to obtain his 60% share in Limited and to have the leases written off.  Id. Ex. 47.  Mr. Massias subsequently produced a draft Memorandum of Understanding (a different document than the MOU discussed previously) outlining the disputes between the brothers in an attempt to mediate

the conflict.[4]  Id. Ex. 48.  Writing off the leases is listed as one of Suresh's claims.  Id.  There is also testimony, which is detailed below, that Suresh repeatedly brought up the need to have the leases written off both before and after the buy out of Gulatee.  See infra section V.D.  That Suresh repeatedly brought up Kumar's failure to release the leases, and that he consulted Mr. Massias about this issue, could be evidence that Suresh believed Kumar had breached their agreement—whether the Settlement Agreement or a separate oral agreement—to release the leases, and he was seeking a resolution of that issue.

Analyzing this evidence of the brothers' intentions is challenging because of the failure of Suresh and Kumar to document their transactions adequately.  See infra section V.D.  As a result, the record arguably provides support for several different interpretations of these events:

- That the parties agreed or did not agree to release the leases in the Settlement Agreement or through a separate oral agreement.

- That each brother had a different conception of what he was agreeing to in the Settlement Agreement or in a separate oral agreement.

- That the nature and scope of the transactions changed over time, such that what Suresh and Kumar were discussing was not the deal they ultimately settled on.

- That the falling out between the brothers caused Kumar to renege on what he had agreed to with Suresh and to use the leases as leverage against A-1 and Suresh, as Gulatee and Chopra had done prior to being bought out.

Although objective evidence of the parties' intention is very relevant, therefore, it is not determinative on summary judgment in resolving whether the Settlement Agreement released the leases or whether there was also an alleged oral agreement.  Accordingly, deciding whose version of this saga is correct will require an assessment of the credibility of witnesses and a weighing of evidence at a trial.

---

[4] Mr. Massias also presciently warned the brothers than failure to resolve the dispute could result "in a costly litigation battle with no winner."  ECF 125, Def.'s Resp. Br., Ex. 48.

### iii. A-1's Position in the English Litigation

The third category of objective evidence relates to the positions the parties took in the English Litigation.  Alliance demonstrates that in the English Litigation, A-1 argued that the Settlement Agreement did not apply to the leases, a contrary position from its stance in this case.  Specifically, Alliance cites the witness statement of John Michael Fordham, Esq., submitted on behalf of Suresh and A-1 in the English Litigation, which asserts that "the fundamental purpose of the Settlement Agreement was to establish the legal structure for the acquisition of [Gulatee's] shares and to settle the disputes which had emerged between the brothers on the one hand and [Gulatee] on the other."  ECF 117, PSOF ¶ 30 & Ex. 20 ¶¶ 35, 63.  Mr. Fordham failed to mention the leases and denied that the Settlement Agreement was intended to resolve any claims between Suresh and Kumar.  Id.  Indeed, he indicated that the negotiations surrounding the Settlement Agreement were only intended to resolve disputes between Gulatee and the Khoslas surrounding the purchase of Limited and FZC, and "[t]hose negotiations never covered, and the resulting documents were never intended to resolve and/or release, any issues and claims between the brothers."  Id.

There is extrinsic evidence from other sources that appears to confirm Mr. Fordham's statement that the Settlement Agreement was intended to resolve disputes surrounding the Khosla brothers' buy out of Gulatee.  For example, Mr. Massias testified that the Settlement Agreement was intended to release Gulatee from liability for the leases, not necessarily to release the leases themselves.  ECF 183, DSOF ¶ 81.  Mr. Massias also offers testimony that indicates he assumed that Gulatee's removal would solve the problem of the leases because the dispute between Gulatee and the Khosla brothers, which made the leases an issue, would go away, not that the leases themselves would necessarily be extinguished.  See id.  ¶ 64.  Also noteworthy

here is Gulatee's absence as a party in this case.   Gulatee was a party to the Settlement Agreement, but he is not a party to this case, presumably because his interest in Limited was transferred to Kumar prior to this litigation.   However, if Gulatee believed the Settlement Agreement, to which he was a party, addressed the leases, it is at least arguable that he would have become involved in this litigation.

A-1 makes a number of arguments in opposition to Alliance's claims with regard to the English Litigation.   First, A-1 contends that because the English Litigation was settled and dismissed without acceptance or adoption of either side's position, the English court did not construe the Settlement Agreement, and judicial estoppel should not apply.   Second, A-1 contends that Alliance also took an inconsistent position in the English Litigation because, unlike in this case, Alliance argued for a broad construction of the release provision of the Settlement Agreement.   Finally, A-1 contends that Alliance should be barred from relying on positions taken in the English Litigation because Alliance previously claimed the English Litigation was irrelevant to this case and denied A-1 discovery on the matter.

Notwithstanding these legal arguments, A-1 was arguably, if not clearly, inconsistent in its treatment of the Settlement Agreement's scope.   Alliance cites this inconsistency as grounds to grant summary judgment.   However, significant disputes of material fact preclude the grant of summary judgment.   Although A-1's inconsistent positions strengthen Alliance's case, the Court is reluctant to resolve such a complex dispute on summary judgment, given the ample disputes of material fact, based only on a witness statement in the English Litigation, which settled without proceeding to trial.

**C. Post-Settlement Leases**

As noted above, the two Post-Settlement Leases were created on September 26, 2012, after the Settlement Agreement was executed.  ECF 117, PSOF ¶¶ 14-15 & Ex. 14-15.  Kumar signed these leases on behalf of Limited.  Id.  No one signed the leases on behalf of A-1.  Id. The parties do not dispute that Limited delivered the metal that is subject of these leases to A-1, that A-1 accepted and used it, and that A-1 has failed to pay for it.  The key dispute between the parties as to these leases centers on whether the metal was leased to A-1 or whether the metal was transferred—not leased—from Limited to A-1 in order to assist A-1 in meeting customer demand.  See ECF 183, DSOF ¶¶ 128-33.

A-1 acknowledges it accepted the metal but contends it never understood Alliance was leasing the metal to it.  A-1 claims that Kumar unilaterally created the leases, signed them, and mailed them to A-1.  A-1 notes that no representative from A-1 ever signed the leases and argues it should not be bound by them.

Alliance argues A-1 agreed to lease the metal from Limited, as A-1 had done previously. Alliance cites testimony that A-1 was expecting the metal, needed it to meet customer demand, and used it.  Alliance also contends that A-1's position is unreasonable because it would require believing that Limited would transfer valuable metal to A-1 essentially as a gift.

Again, there is conflicting testimony in the record as to the September 26, 2012 leases. As with the other leases, the brothers did not adequately document their transaction.  See infra section V.D.  The record is disputed as to what the parties intended, and there is record evidence supporting each party's contentions.  Alliance cites extensive testimony by Patrick Magilligan, an A-1 employee, that A-1 expected to receive the metal from Limited.  See ECF 128, Ex. 2, Pl.'s Resp. to DSOF ¶¶ 92-97.  At the same time, there is testimony casting doubt on whether a

lease was intended, and no one from A-1 signed the purported leases.  ECF 183, DSOF ¶¶ 131-33.  Furthermore, it is possible A-1 thought it was reasonable for Limited to send metal without a lease attached because there is testimony in the record that both Suresh and Kumar stated on multiple occasions that Limited's metal belonged to both of them.  Kumar may have tried to take advantage of Suresh's belief that the metal was A-1's metal by drafting a lease in an attempt to bind A-1.

Given these disputes of material fact, summary judgment as to the September 26, 2012 leases is inappropriate, as the Court will have to assess, at trial, the credibility of witnesses and the weight of the evidence.

**D. Alleged Oral Agreement to Release Leases**

A-1 argues in the alternative that, if the Court concludes the Settlement Agreement did not release the leases, Suresh and Kumar reached a separate oral agreement to release the leases as part of the Larger Business Restructuring.  ECF 183, DSOF ¶¶ 58-65.  A-1 bears the burden of proving the existence of the alleged oral contract.  See Edmondson v. Zetusky, 674 A.2d 760, 764 (Pa. Commw. Ct. 1996).  A-1 must do so by a preponderance of the evidence.  See Fish Net, Inc. v. ProfitCenter Software, Inc., No. 09-5466, 2013 WL 5635992, at *4 n.4 (E.D. Pa. Oct. 15, 2013); Quandry Solutions Inc. v. Verifone Inc., No. 07-097, 2009 WL 997041, at *6 (E.D. Pa. Apr. 13, 2009).[5]

Both Meena Jerath, A-1's outside accountant and an independent contractor working for A-1, and Rajesh Seth, A-1 current President, testified in declarations and at their depositions to

---

[5] The Pennsylvania Supreme Court has not decided which burden of proof applies when proving the existence of an oral contract.  Legendary Art. LLC v. Godard, 888 F. Supp. 2d 577, 585 (E.D. Pa. 2012).  Courts in this district are divided over whether to apply the higher "clear and precise evidence" standard or the lower preponderance of the evidence standard.  Id.  In Quandry Solutions, Judge DuBois concluded, following a review of Pennsylvania authority, that the "clear and precise" standard applied to oral modifications to a written contract, an oral contract to make a will, and an oral contact enforced against a decedent's estate, but that the preponderance of the evidence standard applied to "garden variety oral contracts."  Quandry Solutions, 2009 WL 997041 at *6.  The Court finds this framework useful and will apply the preponderance of the evidence standard to this alleged oral contract.

the existence of an oral agreement between Suresh and Kumar to release the leases.  Id. ¶¶ 58-63.

Ms. Jerath's testified as follows:

- It was always her understanding that, as a result of the Larger Business Restructuring, the leases would be extinguished.  Id. ¶¶ 58-59.

- She believed that the "crux" of the Settlement Agreement and the acquisition of Limited and FZC by Suresh and Kumar was to write off the leases.  Id. ¶ 60.

- During the summer of 2012, there were discussions between Suresh and Kumar that she overheard at which "Suresh always said, I want to write off the leases, like a broken record.  And sometimes [Kumar] would be quiet.  And a few times he did say, okay, we'll write off the leases, let's move, move on."  Id. ¶ 61.  She also testified that Suresh and Kumar discussed writing off the leases from October 2011.  Id.

Mr. Seth testified as follows:

- It was his understanding, based on conversations with Suresh and Kumar and document he reviewed, that the leases would be extinguished upon completion of the Larger Business Restructuring.  Id. ¶¶ 58-59.

- That there was an oral agreement between Suresh and Kumar to write off the leases as part of their purchase of Limited and FZC.  Id. ¶¶ 62-63.  Mr. Seth testified that he was present when Suresh and Kumar discussed this oral agreement.  Id. ¶ 62.

- The purpose of the Larger Business Restructuring was to write off the leases.  Id. ¶ 63.

Suresh also testified as to the alleged oral agreement with Kumar to release the leases.  Id. ¶ 67.

He claimed that Kumar had "always" agreed in conversations about the Larger Business Restructuring to release the leases once the brothers had gained control of Limited and FZC.  Id.

Leena Khosla, Suresh's wife, also testified that she heard Suresh and Kumar orally agree to release the leases.  Id. ¶ 68.

A-1 also contends that Mr. Massias, the brothers' Gibraltar lawyer, testified that a primary purpose of the Larger Business Restructuring was to extinguish the leases.  Id. ¶ 64.

There is also evidence A-1 cites that Jones Day, counsel for Gulatee, recognized that the leases would be extinguished upon completion of the Larger Business Restructuring.  Id. ¶ 65.

A-1 also produces evidence that the brothers often entered into oral agreements in the course of business.  Id. ¶ 86.  Ms. Jerath testified that Suresh and Kumar frequently failed to document transactions.  Id. ("Nothing is documented.  They do everything verbally.  They don't document things.").  Mr. Seth offered similar testimony.  Id. ("It's all oral agreement.  It was family business.  They bought—the brothers did business on oral agreement all their life for 40 years.").  Suresh also testified that he and Kumar did "handshake deals" all the time, and the agreement to write off the leases was such a deal.  Id.  The brothers' failure to document transactions was also discussed on the record at the July 21, 2015 hearing.  ECF 177, Hr'g Tr. 42-43, July 21, 2015.[6]

Alliance makes two primary arguments in response to A-1's claim of an alleged oral agreement.  First, Alliance contends this evidence should be barred under the parol evidence rule as an attempt to contradict the plain meaning of the Settlement Agreement.  However, A-1 can argue in this manner because the existence of a written agreement does not prevent a party from seeking to prove the existence of a separate, distinct oral agreement involving different subject matter.  See Lanard & Axilbund, LLC v. Wolf, No. 14-0234, 2014 WL 4722702, at *3 & n.4 (E.D. Pa. Sept. 23, 2014).  A-1 makes that argument here.  It attempts to establish the existence of an independent oral agreement to release the leases as an alternative to its claim that the Settlement Agreement released the leases.

Second, Alliance denies the alleged oral agreement existed.  Both Sameer Khosla and Kumar denied at their depositions that such an oral agreement existed.  ECF 170, Def.'s Supp. Br., Ex. H, 435:4-12 & Ex. E, 803:19-804:20.  Alliance contends the parties' generalized expressions of intent with regard to the release of the leases was at most an unenforceable agreement to agree to release the leases, but there is no evidence such an agreement was ever

---

[6] However, the existence of the Settlement Agreement tends to discredit this testimony.

executed orally or in writing.  See, e.g., Fish Net, 2013 WL 5635992, at *6 (holding that "an agreement to agree . . . is not capable of being enforced"); Highland Sewer & Water Auth. v. Forest Hills Mun. Auth., 797 A.2d 385, 390 (Pa. Commw. Ct. 2002) (same).  Alliance points to November 6, 2012 and February 27, 2013 emails from Suresh to Kumar in which Suresh requests that Limited and FZC write off the leases as evidence the brothers had not agreed orally to do so.  Pls.' Supp. Br. at 2-3.  Alliance also notes that Mr. Seth appeared to contradict himself by testifying that only after Suresh and Kumar took over Limited and FZC would they decide whether to write off the leases.  ECF 185, Seth Dep. 507:12-23.  Furthermore, Alliance argues that the alleged oral agreement fails for lack of evidence of contract formalities, including consideration.

Alliance's evidence casts doubt on whether there was an oral agreement, as opposed to a preliminary understanding or an agreement to agree.  However, the testimony of Ms. Jerath and Mr. Seth, evidence from Mr. Massias and Jones Day indicating the leases were to be extinguished, and testimony that Suresh and Kumar frequently transacted business orally creates a dispute of material fact about whether an oral agreement existed.  Accordingly, the Court will deny summary judgment on this issue.

**E. A-1's Set-Off Defense**

The Court will now address A-1's affirmative defense of set-off.  A-1 advances two separate bases for its set-off claims.  First, A-1 contends Alliance aided and abetted Suresh and Kumar in diverting corporate opportunities from A-1 by allegedly transferring A-1's metal from non-party Impala to Limited for less than fair market value.  Second, A-1 argues Alliance aided and abetted Kumar in breaching fiduciary duties he owed A-1.  Alliance argues A-1's affirmative defenses fail as a matter of law.  The Court agrees.

**1. Transactions with Impala**

A-1's first basis for set-off relates to a number of transactions and claims that occurred between 1996 and 2005.  A-1 contends that between 1996 and 2005, Alliance aided and abetted Suresh and Kumar in diverting A-1's corporate opportunities by facilitating transfers of millions of dollars of A-1 metal's from Impala to Limited at less than fair market value.  See ECF 183, DSOF ¶¶ 26-31.  A-1 asserts these transactions caused it damage because it was deprived of the fair market value of the metal and that it can now present evidence in this case in order to reduce or eliminate any damages which it may otherwise owe to Alliance.

However, A-1 failed to assert the facts alleged in the set-off defense in a timely fashion against Alliance or other parties.  Pennsylvania has a two year statute of limitations for breach of fiduciary duty claims.  42 Pa. Cons. Stat. Ann. § 5524(7); Langman v. Keystone Nazareth Bank & Trust Co., 502 F. App'x 220, 220 (3d Cir. 2012) (not precedential); Maillie v. Greater Del. Valley Health Care, Inc., 628 A.2d 528, 532 (Pa. Commw. Ct. 1993).  Under Pennsylvania law, a set-off claim must be brought within the applicable statute of limitations.  See Harmer v. Hulsey, 467 A.2d 867, 869 (Pa. Super. Ct. 1983).

Here, the transactions at issue occurred between 1996 and 2005, so the two year statute of limitations has long since run on these claims.  The statute of limitations would have prevented A-1 from asserting these facts as a counterclaim, a problem A-1 attempts to circumvent by characterizing these facts as an affirmative defense.  But A-1 cannot avoid the statute of limitations in this manner.

A-1 contends that the statute of limitations should not bar these claims because (1) Alliance has not established that there is no dispute about the determinative date for the limitations period and (2) A-1's breach of fiduciary duty claim is subject to the discovery rule

because A-1 only learned of the breach of fiduciary duty when Mr. Seth took over as President of A-1 from Suresh.  However, in its Amended Statement of Undisputed Facts, A-1 states that the transactions at issue took place between 1996 and 2005.  See ECF 183, DSOF ¶ 26.  A-1 has also not established that the discovery rule applies to toll the statute of limitations on its set-off claim, as there is evidence that Suresh, who controls A-1, knew of the transactions at the time they occurred.  See id. ¶ 27.  Furthermore, A-1 has asserted that Suresh and Kumar in effect controlled Alliance when these transactions occurred because, in A-1's view, Gulatee and Chopra were mere constructive trustees for the Khosla brothers.  See id. ¶¶ 24-25.  This further undermines A-1's position with regard to set-off.

The Court also concludes that A-1's set-off defense does not qualify as such under Pennsylvania law for the reasons discussed by Judge Slomsky in his recent decision Sayre v. Customers Bank, No. 14-3740, 2015 WL 3458790, at *9-10 & n.7 (E.D. Pa. May 29, 2015).  A-1's set-off theory includes breach of fiduciary duty and related tort claims against Suresh and Kumar and other non-parties.  A-1 cannot avoid the conclusion that the facts alleged have no relationship to the present dispute, concerning the scope of the Settlement Agreement or the alleged oral agreement, but relate to past events, in unrelated matters.

Nor can A-1 preserve this affirmative defense by filing two expert reports.  The Court will not allow expert opinions to take the place of genuine issues of fact, or to create a proper affirmative defense when settled law demonstrates that the set-off defense is merely an attempted end-run around the applicable statute of limitations.

Moreover, to the extent that A-1 frames its set-off contentions related to the 1996-2005 transactions as an attempt to seek equitable relief, the Court similarly holds that laches apply to preclude A-1 from asserting those claims.

**2. Post-Settlement Leases**

A-1 also contends it is entitled to set-off because Alliance aided and abetted Kumar in breaching fiduciary duties he owed to A-1 when Kumar allegedly bound A-1 to the Post-Settlement Leases without authorization.  A-1's argument fails as a matter of law.  Kumar controlled Limited when these two leases were allegedly created, and both A-1 and Alliance agree Kumar signed the leases on behalf of Limited, not A-1.  See ECF 177, Hr'g Tr. 37:2-13; 44:14-18, July 21, 2015.  Although A-1 disputes the validity of these leases, there is no evidence in the record that Kumar claimed he was signing the leases on behalf of A-1, that he breached any fiduciary duty owed to A-1, or that Alliance aided and abetted such a breach.

For these reasons, the Court will **GRANT** Alliance's request for summary judgment as to A-1's set-off defense.

### VI. Conclusion

On summary judgment the Court is limited to evaluating whether there is a dispute of material fact and deciding legal issues.  Determining which side's account is more accurate depends on an analysis of witness credibility, a weighing of conflicting evidence, and a judgment that is best made after a trial, not at summary judgment.  The Court believes the legal construction of the Settlement Agreement may narrow the scope of the trial.  However, the disputed factual issues with regard to the Settlement Agreement and alleged oral agreement make summary judgment inappropriate as to those matters.

Accordingly, the Court will **DENY** Alliance's motion for summary judgment with regard to whether the Settlement Agreement released the leases and whether there was an alleged oral agreement between the parties.  The Court will also **DENY** A-1's request for summary judgment made at oral argument and in its August 4, 2015 supplemental brief (ECF 182).

However, because A-1's set-off defense fails as a matter of law, the Court will **GRANT**

Alliance's request for summary judgment as to that affirmative defense.[7]

O:\CIVIL 13\13-2510 alliance industries v. A-1 specialized\13cv2510.08.19.15.memo.msj.docx

---

[7] As noted, the Court will reserve its decision on summary judgment as to FZC's capacity to join this lawsuit until after the September 9, 2015 hearing.